# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 21-6007

_____

In re: Racing Services, Inc.

*Debtor*

------------------------------

State of North Dakota, ex rel. Wayne Stenehjem, Attorney General

*Claimant - Appellant*

v.

Susan Bala; Kip M. Kaler, Trustee

*Objectors - Appellees*

_____

Appeal from United States Bankruptcy Court
for the District of North Dakota - Fargo

_____

Submitted: November 4, 2021
Filed: January 7, 2022

_____

Before SHODEEN, DOW and RIDGWAY, Bankruptcy Judges.

_____

DOW, Bankruptcy Judge

This appeal centers on two claims. The first is a claim (the "Statutory Claim") filed by the State of North Dakota, ex rel. Wayne Stenehjem, Attorney General (the "State"), as assignee of Team Makers Club, Inc. ("Team Makers"). Susan Bala ("Bala"), a creditor and sole equity holder of Racing Services, Inc. (the "Debtor"), objected to the Statutory Claim as did the Chapter 7 Trustee. The bankruptcy court denied the Statutory Claim, and the State appealed. On appeal to this Panel, a portion of that ruling was reversed and remanded for further consideration. On remand, the bankruptcy court sustained Bala's objection to the Statutory Claim. It also denied the second claim asserted by the State (the "Contract Claim"). The State appealed. For the reasons that follow, we affirm.[1]

The other matters before us are a Motion to Strike and a Motion for Sanctions filed by Bala against the State. As explained below, the Motion to Strike is denied as moot, and the Motion for Sanctions is denied.

**STANDARD OF REVIEW**

A bankruptcy court's legal conclusions are subject to *de novo* review. *Fisette v. Keller (In re Fisette)*, 455 B.R. 177, 180 (8th Cir. BAP 2011). Factual findings will only be overturned if they are clearly erroneous. *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006). Here we review the bankruptcy court's factual findings and legal conclusions regarding three issues: 1) the merits of the Statutory Claim, 2) the State's efforts to assert the Contract Claim and supplement the record, and 3) the merits of the Contract Claim.

---

[1]The bankruptcy court ruling was issued by the Honorable Thad J. Collins, Chief Judge of the United States Bankruptcy Court for the Northern District of Iowa, sitting by designation.

**FACTUAL BACKGROUND**

This case has a complicated history that has spanned over 17 years.[2] While a detailed recitation of the facts is not necessary for this ruling, an abbreviated version of the factual and procedural history is warranted.[3]

The Debtor was a licensed service provider under North Dakota's pari-mutuel wagering system, and filed for chapter 11 in 2004. The case was converted to chapter 7 several months later. Ten years into the case, the district court ruled that the State was not authorized to collect taxes from the Debtor under North Dakota's law on account wagering. As a result, the State settled with the Debtor's estate, agreeing to pay over $15 million. Creditors asserted claims for a piece of the large cash infusion. The State did not raise the rights of Team Makers or any other charities at that time, nor did Team Makers file a claim. In November of 2018, the bankruptcy court issued its final ruling on claims after a week-long evidentiary hearing.

The following month, more than 14 years into the case, the State filed a new proof of claim. The bankruptcy court held an evidentiary hearing (the "Evidentiary Hearing"), and at the close of evidence, the State orally moved to amend it to add a

---

[2] A "long procession of [judges] has come in and gone out" during that time, and still the suit "drags its weary length before the Court." *See Stern v. Marshall*, 564 U.S. 462, 468 (2011) (quoting C. Dickens, Bleak House, 1 Works of Charles Dickens 4-5 (1891)). We find this case as worthy of the reference as Chief Justice Roberts did in the *Stern* case.

[3] The following cases provide the background in more detail: *United States v. Bala*, 489 F.3d 334 (8th Cir. 2007); *In re Racing Services, Inc.*, 482 B.R. 276 (Bankr. D.N.D. 2012); *In re Racing Services, Inc.*, 779 F.3d 498 (8th Cir. 2015); *In re Racing Services, Inc.*, 595 B.R. 334 (Bankr. D.N.D. 2018).

theory of breach of contract as additional grounds for its claim. Bala opposed the oral motion to amend. The court ultimately denied the State's claim on behalf of the charities, finding that the State lacked *parens patriae* authority to assert it. It also found that the Team Makers claim was barred by laches.

On appeal, we affirmed the bankruptcy court's ruling on the State's lack of standing, but reversed the court's ruling on laches, and remanded the case for reconsideration of the Team Makers claim and any other objections thereto.[4]

The bankruptcy court held a status conference with the parties to determine how to proceed on remand. Hours before the conference, the State filed yet another new claim which purported to formally include the breach of contract claim the State had previously attempted to assert orally. Bala argued that the court should rule on the existing record, and requested that it deny the Contract Claim on the merits. The State argued that the Bankruptcy Appellate Panel's ("BAP") remand order was broad enough to permit consideration of its amended claim and requested that the court supplement the evidentiary record.

The bankruptcy court denied the entirety of the State's claims. In so ruling, the court analyzed the two distinct bases for the State's claim(s): 1) the Statutory Claim made under certain provisions of the North Dakota Administrative Code, North Dakota Century Code, and North Dakota Constitution, and 2) the Contract Claim based on the simulcast parimutuel wagering service agreements between the Debtor and Team Makers. Besides the substantive issues raised, the latter involved

---

[4] *See North Dakota ex rel. Stenehjem v. Bala (In re Racing Services)*, 619 B.R. 681 (8th Cir. BAP 2020).

the procedural questions of whether to allow the amendment of the claim on remand, and if so, whether to allow additional evidence to support the new claim.

With respect to the motion to amend the claim to add breach of contract, the bankruptcy court denied it based on the court's inherent authority to control its docket and prevent undue delays in the disposition of its cases under Rule 1 of the Federal Rule of Civil Procedure and section 105 of the Bankruptcy Code. In addition, the court concluded that there was no justification to allow additional evidence, denying the State's request to supplement the record. The court also ruled that even if it were to consider the Contract Claim, the claim had no merit.

With respect to the merits of the statutory claim, the bankruptcy court agreed with Bala -- the State failed to articulate an enforceable right to payment or to fully define how net proceeds were not properly paid. Thus, Bala's objection to the statutory claim was sustained.

The State's primary assertion in this appeal is that the bankruptcy court erred when it disallowed the Statutory Claim because North Dakota's Constitution and statutes, as well as the Eighth Circuit and District Court, direct that Team Makers should recover the remaining tax settlement funds (*i.e.*, the excess after the payment of allowed claims), not the Debtor. Additionally, it asserts that the court erred when it disallowed the Contract Claim on both procedural and substantive grounds, and when it declined to consider the supplemental evidence.

**DISCUSSION**

**Statutory Claim**

One of the bases of the State's Statutory Claim is North Dakota's constitutional requirement that "the entire net proceeds of such games of chance are

5

to be devoted to educational, charitable, patriotic, fraternal, religious, or other public-spirited uses." N.D. Const. Art. XI, §25. However, the State neglects to include the context of that language. Section 25 prohibits the *legislative assembly* from authorizing games of chance with certain exceptions, one of those being when the entire net proceeds are to be devoted to the aforementioned uses. Nothing in that section of the North Dakota Constitution governs the actions of private parties such as the Debtor. Thus, Section 25 is inapplicable.

The State also suggests that the Court of Appeals ruled that the account wagering in which the Debtor was engaged is subject to the "net proceeds" requirement of Section 25, and that RSI holds no claim to the tax settlement funds. No such conclusion is set forth in the opinion. The Eighth Circuit, *in dicta*, stated that "[w]ithout the assessment of taxes, more money is available for the beneficent purposes" enumerated in Section 25. It went on to note that "[I]f the state were to determine some part of the net proceeds of statutorily authorized account wagering were not serving such purposes, the state could simply stop those unconstitutional activities." *PW Enterprises., Inc. v. N.D. (In re Racing Services, Inc.)*, 779 F.3d 498, 506 (8th Cir. 2015). As Bala points out, the Eighth Circuit did not rule that North Dakota's Constitution authorized a cause of action against a private party; rather, it confirmed that the State has other means to enforce the relevant statutes.

The State admits that the Eighth Circuit has determined that section 53-06.2-11 (the "Takeout Statute") does not apply to account wagering. *See In re Racing Services*, 779 F.3d at 500.[5] The Takeout Statute was enacted as part of the legislation

---

[5]The State nevertheless spends a substantial amount of its briefing on the notion that the Takeout Statute created significant relationships during the time period the

passed in 1987 in North Dakota authorizing pari-mutuel wagering on live horse racing. The Debtor was authorized under the statute to separately contract with eligible non-profit organizations that operated off-track betting. Under such an arrangement, site operators received a portion of each wager made at their location and the Debtor retained a percentage of each bet (the "takeout") for handling the betting transaction.

The bankruptcy court relied on the plain language of the Takeout Statute to reach its conclusion that the statute's payoff provision only applies to live racing and simulcast wagering, not to account wagering. There are no amounts deducted for expenses from account wagers under the plain language of the Takeout Statute.[6] Rather, the statute authorized the Debtor to apply the takeout rate of the host jurisdiction.

In this case, the account wagering system worked without the application of the Takeout Statute. The Debtor had contracts with charity site operators that were approved by the North Dakota Racing Commission, and the Debtor could adopt the takeout percentage dictated by the host jurisdiction where the race was conducted. N.D. Cent. Code §53-06.2-10.1. The Debtor was transparent insofar as its annual

---

Debtor operated, and consequently, the Takeout Statute serves as an "operative fact" by providing the formula for the distribution of the remaining tax settlement funds to charitable organizations. We fail to see any merit in this argument (and in fact, find it incomprehensible), so it is not considered in our analysis. Furthermore, the law in effect at the time and legal precedents govern the results of this case, not "operative facts."

[6] The Takeout Statute was amended in 2007 to include account wagering, but that did not govern the Debtor's use of the takeout during the applicable period here, from 2001 - 2007. *U.S. v. Bala*, 489 F.3d 334, 338-39.

license contained the income and disbursements; the Debtor's license was approved by the Racing Commission year after year.

When the parimutuel statutes were amended in 2007, the legislature did not adopt the "net proceeds" definition urged by the State. In fact, the Eighth Circuit addressed the concept this way:

> Prior to and during the period in question, the Commission had no rules in place either defining account wagering net proceeds or prescribing how or when RSI must disburse its net proceeds to charity. The North Dakota constitutional term 'net proceeds' is inherently vague. The parimutuel statute that cross references §53-06.1-11.1(2) does not even use the term net proceeds. *See* §53-06.2-11(5).

*Bala*, 489 F.3d at 339. If the North Dakota legislature and the Eighth Circuit cannot define the "net proceeds," then the term cannot conceivably form the basis of a claim. Thus, the State's efforts to utilize the Takeout Statute to prevent Bala and the Debtor from retaining the remaining settlement proceeds, and to justify payment of the proceeds to Team Makers, must fail.

In addition, although the State makes a lot of noise about the "net proceeds" to which Team Makers is entitled, nowhere in the record does the State identify the amount it is claiming other than in its proffered supplement to the record that was ultimately disallowed.

From the State's perspective, the crux of the Statutory Claim is that Team Makers is entitled to the remaining tax settlement funds under North Dakota law, and that the Debtor does not have a claim to them. However, the Debtor has not asserted a claim nor does it need to prove its right to the funds. Pursuant to Section 726 of the Bankruptcy Code, the Debtor is entitled to receive any excess funds

8

available after all allowed creditor claims have been paid in full. That is simply the framework in which the bankruptcy system operates. The priorities set forth in federal law (*i.e.,* the Bankruptcy Code) cannot be trumped by state law as the State contends. *See In re Old Carco LLC,* 424 B.R. 633, 640 (Bankr. S.D.N.Y. 2010) (while state law may determine certain rights of a party, the determination of any such claim's priority is the exclusive province of federal bankruptcy law). Furthermore, from a logical standpoint, since the Debtor is the entity that paid the taxes originally, it follows that the reimbursement of those taxes (that were determined to be improperly paid) should inure to the benefit of the Debtor after distribution under the bankruptcy priority scheme.

Bala raised serious questions as to the validity of the Statutory Claim and the State failed to provide sufficient answers or present evidence to support its position. Therefore, we conclude that the bankruptcy court did not err in sustaining Bala's objection to the Statutory Claim.

**Contract Claim[7]**

The State contends that the bankruptcy court erred in denying its request to supplement the record to include exhibits related to the Contract Claim. That position lacks merit. In general, a court has discretion to grant or deny motions to reopen the evidentiary record. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331 (1971). The trial court's decision to reopen should be premised upon

---

[7] As a preliminary matter regarding the Contract Claim, the State alleges that Team Makers lacked notice of the bankruptcy case. While it is true that Team Makers is not listed as a creditor in the Debtor's Schedules, there was no basis for the Debtor to do so because it did not owe any money to Team Makers at the time of the bankruptcy filing. Additionally, as Bala/Debtor points out, there is evidence that Team Makers had actual knowledge of the case.

criteria that are flexible and fact-specific, such as the prospect of prolonging the trial. *Blinzler v. Marriott Int'l., Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996). The same holds true in the context of remand -- the determination whether to reopen the record on remand is committed to the trial court's discretion. *In re Grimm*, 168 B.R. 102, 106 (Bankr. E.D.Va. 1994)(citing *Zenith*, 401 U.S. at 331). In the absence of an overt directive, the trial court evaluates whether to reopen the evidentiary record on remand to receive probative evidence that would be logically responsive to the appellate court's analysis. *In re Mesaba Aviation, Inc.*, 350 B.R. 105, 111 (Bankr. D. Minn. 2006). Courts have considered the probative value of the evidence proffered, the proponent's explanation for failing to offer such evidence earlier, and the likelihood of undue prejudice to the proponent's adversary. *See, e.g., Confederated Tribes of Warm Springs Reservation of Oregon v. U.S.*, 101 Fed. Appx. 818, 822-23 (Fed. Cir. 2004).

Here, the precise language used in the BAP's prior opinion was "We therefore reverse the Bankruptcy Court's ruling that the Team Maker Claim assigned to the State was barred by laches, and remand the case to the Bankruptcy Court for reconsideration of the Claim and any other objections thereto." There was no directive, overt or otherwise, to reopen the record on remand. Therefore, it was up to the bankruptcy court to make that determination based on the facts and the factors listed above. The record demonstrates that the parties were directed by the bankruptcy court in no uncertain terms at the Evidentiary Hearing to produce whatever evidence was necessary to prove or disprove any claim asserted by the State so there would be no need for more proceedings in case of remand.[8] The State

---

[8] The bankruptcy court made it abundantly clear that it considered the Evidentiary Hearing to be "[a] put up or shut up hearing."

had every opportunity to present its case. The evidence the State attempted to submit was available to the State at the time of the Evidentiary Hearing. The State has had years and years to prepare its case in support of its Claim. We find that the bankruptcy court did not abuse its discretion in holding that the record was closed.

Whether to allow a party to amend its proof of claim is likewise within the sound discretion of the court. *In re Devey*, 590 B.R. 706, 727 (Bankr. D.S.C. 2018); *In re Enron Corp.*, 419 F. 3d 115, 133 (2d Cir. 2005). After a claim objection is filed, bankruptcy courts generally consider the same equitable factors courts used when evaluating motions to amend under Rule 15 of the Federal Rules of Civil Procedure (made applicable by Fed. R. Bankr. P. 7015).[9] *See, e.g., Devey*, 590 B.R. at 727-28. The Supreme Court has articulated these to include undue delay, bad faith, undue prejudice, repeated failures to cure defects and futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Other courts have formulated a three-part test. First, the proposed amendment must not be a veiled attempt to assert a distinctly new right to payment as to which the debtor was not fairly alerted by the original claim. Second, the amendment must not result in undue prejudice to other claim holders. Third, the need to amend must not be the product of bad faith or dilatory tactics on the part of the claimant. *In re Amoroso*, 2008 WL 8444823, *3 (9th Cir. BAP July 11, 2008) (citations omitted). When an amendment is sought during and after trial, it should not be permitted if the objecting party satisfied the court that the evidence would prejudice that party. Fed. R. Civ. P. 15(b)(1). *See also Deasy v. Hill*, 833 F.2d 38, 41-42 (4th Cir. 1987) (efforts to amend

---

[9] The State asserts that there were no formal objections to the Contract Claim, but the record refutes that position. Bala opposed the State's oral motion to amend at the Evidentiary Hearing, in a brief following the status conference, and again at trial.

on the eve of trial, much less at trial, are disfavored); *In re Brown*, 603 B.R. 786, 793 (Bankr. D.S.C. 2019); *Thompson-El v. Jones*, 876 F.2d 66, 69 (8th Cir. 1989).

Considering these factors, the facts in this case overwhelmingly weigh against allowing the amendment of the State's claim. The State made its oral motion to amend *after* an evidentiary hearing, and more than 14 years after the bankruptcy filing. The State made another attempt to amend its claim on remand, just hours before the bankruptcy court's status conference. Although admittedly the landscape of the case changed when the $15 million settlement was paid to the bankruptcy estate, the State had multiple opportunities throughout this case to assert its claims. Allowing the amendment at this point would have indeed caused undue prejudice to the Debtor in the form of additional discovery and costs, resulting in yet more delays.

While the bankruptcy court could have relied on the Rule 15 factors in denying the amendment, it relied instead on its right and inherent authority to do so.[10] Federal courts have the inherent authority to control various aspects of the cases before them so that they can protect their proceedings and judgments in the course of discharging their traditional responsibilities. *Blue Cross & Blue Shield of N.C. v. Jemsekk Clinic, P.A. (In re Jemsek Clinic, P.A.)*, 441 B.R. 756, 786 (Bankr. W.D.N.C. 2010); *Chase v. Epps,* 74 F. App'x 339, 343 (5th Cir. 2003)(recognizing a court's inherent power to control its docket and prevent undue delays in the disposition of its cases). As the court stated in *In re Eisen*, 31 F.3d 1447, 1451 (9th Cir. 1994), the court "is in the best position to determine what period of delay can

---

[10] Although the bankruptcy court did not use the Rule 15 analysis, it is relevant, and the conclusion under this analysis is supported by the evidence. It is well-established that the BAP can affirm a bankruptcy court on any ground supported by the record. *In re Negus-Sons*, *Inc.*, 460 B.R. 754, 757 (8th Cir. BAP 2011).

be endured before its docket becomes unmanageable." The court's authority to control its own docket reflects the public policy underlying Federal Rule of Civil Procedure 1: "the just, speedy, and inexpensive determination of every action." This authority is also granted in Section 105(a) of the Bankruptcy Code. That section gives courts the equitable powers necessary to carry out the provisions of the Code, including orders enabling bankruptcy judges to maintain control of the courtroom and administration of dockets in cases before them. *In re Miller*, 529 B.R. 73, 85 (Bankr. E.D. Pa. 2015)(citing *In re Volpert*, 110 F.3d 494, 501 (7th Cir. 1997)).

The State argues that the bankruptcy court erred by not considering the Contract Claim because it failed to follow the BAP's holding in the prior appeal that laches could not apply, contending that if a claim is tardily filed in a Chapter 7, but filed prior to distribution, it should be considered on its merits. The State mischaracterizes the BAP's ruling. The BAP ruled that "*laches* is not available as a matter of law to tardily-filed claims in a Chapter 7 case as long as they are filed in time to permit distribution under §726(a)…." (emphasis added). That language did not preclude the bankruptcy court from exercising its inherent authority to manage its own docket and control various aspects of the cases before it. Accordingly, the bankruptcy court's decision is not inconsistent with the BAP's previous ruling.

The bankruptcy court insisted that this marathon litigation must end, and we agree. The time to reach a final adjudication on claims is long overdue. We conclude that the bankruptcy court did not abuse its discretion in denying the addition of the Contract Claim.

Although the bankruptcy court decided that the Contract Claim should not be considered, it nonetheless addressed its substance, namely that the parimutuel

wagering service agreement between the Debtor and Team Makers was breached because the Debtor significantly underpaid Team Makers.

A party asserting a claim for breach of contract has the burden of proving the following elements:  1) the existence of a contract, 2) breach of the contract, and 3) damages resulting from that breach.  *Ahlgren v. Morrison (In re McM, Inc.)*, 609 B.R. 511, 516 (Bankr. D.N.D. 2019) (citations omitted).  The State failed to meet its burden.

Regarding the fundamental element of the existence of a contract, the State submitted a contract between the Debtor and Team Makers, but no evidence that the contract was in effect during the applicable time period (*i.e.*, that it had been renewed).  The record indicates that the agreement contained an automatic renewal option subject to written notice of non-renewal from either party, and that there was some uncertainty surrounding the dates it was in effect.  No evidence was produced that conclusively established that the agreement was in place during the relevant timeframe.

Even if the bankruptcy court had found that the State proved the existence of a contract, the State failed to prove an actual breach.  In order to meet its burden, the State would have had to demonstrate that the Debtor failed to pay an additional 4% to Team Makers as required under their agreement.  However, the State offered no evidence of the amounts paid by the Debtor to Team Makers, and how that constituted a breach; the State merely alleged that the breach occurred.

Likewise, the State did not prove the amount of damages that resulted from the alleged breach.  It admitted that no one testified at the Evidentiary Hearing as to

the total amount paid Team Makers, but claims that comments made by RSI's counsel at the hearing were "suggestive" that Team Makers was not paid the 4%. Any evidence the State produced about damages was indirect, at best, requiring the bankruptcy court to make inferences about the amount. In its appellate brief, the State attempts to rectify this by establishing the difference between the amount Team Makers actually received from the Debtor and the amount it should have received per the contract. However, the information was included in the exhibits to the Contract Claim that the State tried to add to the evidentiary record. Since the bankruptcy court properly denied the supplementation of the record, it is not included in the record before us.

We conclude that the State failed to meet its burden of proof with respect to the Contract Claim. Therefore, the bankruptcy court's ruling denying the Contract Claim is not clearly erroneous.

**Motion to Strike and for Sanctions**

Bala requests that pages 10 through 18 of the State's reply brief be stricken. In support of her argument, Bala contends that these pages contain: (1) new arguments; and (2) blatantly false statements.

The arguments contained in these specific pages have not been relied upon in reaching our decision. Where a motion to strike portions of a brief contains argument not relied upon in reaching a decision, the argument is treated as moot and the motion shall be denied. *Adamar of N.J. Inc. v. Innerbichler (In re Innerbichler)*, Nos. NM-12-032, NM-12-038, 09-01126, 2013 Bankr. LEXIS 727, at *23 (10th Cir. BAP Feb. 25, 2013); *see also Page v. JP Morgan Chase Bank (In re Page)*, 592 B.R. 334, 338 (8th Cir. BAP 2018) (noting the bankruptcy court denied a motion to strike

as moot when the court did not rely on the statement in rendering judgment). As such, Bala's Motion to Strike is denied as moot.

Bankruptcy Rule 8020(b) allows a Bankruptcy Appellate Panel to discipline or sanction an attorney for misconduct after notice and hearing if requested. Bankruptcy Rule 8020 further requires a two-step process, where the panel must first determine the appeal itself was frivolous and then examine the requirements of the rule to impose sanctions. *Lumb v. Cimenian (In re Lumb)*, 401 B.R. 1, 9 (1st Cir. BAP 2009); *see also Scott v. Anderson (In re Scott)*, 627 B.R. 134, 142 (8th Cir. BAP 2021) (noting that if a BAP finds an appeal to be frivolous, it may then award just damages).

"An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." *Tina Livestock Sales, Inc. v. Schachtele (In re Schachtele)*, 343 B.R. 661, 666 (8th Cir. BAP 2006) (quoting *Newhouse v. McCormick & Co., Inc.*, 130 F.3d 302, 305 (8th Cir. 1997)). The arguments presented in the State's reply brief, though unpersuasive, are not frivolous within the meaning of Bankruptcy Rule 8020. For this reason, Bala's Motion for Sanctions is denied.

## CONCLUSION

For the reasons stated herein, the bankruptcy court's order is affirmed. Additionally, Bala's Motion to Strike and for Sanctions is denied.

_____